IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DERRICK ANDERSON, et al.,              §
                                       §
                        Plaintiffs,    §
                                       §   Civil Action No. 3:19-CV-2311-D
VS.                                    §
                                       §
OCTAPHARMA PLASMA,                     §
INCORPORATED, et al.,                  §
                                       §
                        Defendants.    §

MEMORANDUM OPINION
AND ORDER

This is a diversity action by eight plaintiffs who assert Texas-law claims against four

defendants based on their alleged misconduct in processing donated plasma samples that

resulted in false positive screening results for Human Immunodeficiency Virus ("HIV") and

Hepatitis C that were reported to third parties and never corrected.  Defendant BioLife

Plasma Services L.P. ("BioLife") moves to dismiss plaintiffs' third amended complaint under

Fed. R. Civ. P. 12(b)(6) and 9(b), and defendants Octapharma Plasma, Incorporated

("Octapharma"),[1] CSL Plasma Inc. ("CSL"), and ImmunoTek Bio Centers, LLC

("ImmunoTek") move under Rule 12(c) for judgment on the pleadings.  For the reasons

explained, the court grants the motions in part and denies them in part.  The court also

permits plaintiffs to file an opposition response before it dismisses claims on a handful of

_____

[1]Octapharma filed its motion under seal.  Because this memorandum opinion and
order does not disclose sensitive information that defeats the purpose of the sealed filing, the
court is not filing it as a sealed opinion.

grounds that it is raising *sua sponte*.

I

Because the pertinent background facts and procedural history of this case are set out in *Anderson v. Octapharma Plasma, Inc.* (*Anderson I*), 2020 WL 1083608, at *1-2 (N.D. Tex. Mar. 6, 2020) (Fitzwater, J.), the court will primarily summarize the background facts and procedural history that are pertinent to today's decision.

This is an action by plaintiffs Derrick Anderson ("Anderson"), Gary Baskett ("Baskett"), Marlon Griggs ("Griggs"), Daniel Seals ("Seals"), Demetria Jackson ("Jackson"), Randee Holt ("Holt"), Brandie Carver ("Carver"), and Christopher Richie ("Richie") against defendants Octapharma, CSL, ImmunoTek, and BioLife.  According to plaintiffs' third amended complaint,[2] defendants are primarily engaged in the business of selling products and services related to plasma and other blood products.  Each defendant owned, operated, and controlled a collection center.  Each plaintiff (or, in the case of plaintiff Holt, her husband, Seals) donated plasma to one of the defendants.

Relevant to the instant motions to dismiss and for judgment on the pleadings, plaintiffs allege that plaintiffs Carver and Richie donated plasma at defendant BioLife's

---

[2]In deciding defendants' motions, the court construes the third amended complaint in the light most favorable to plaintiffs, accepts all well-pleaded factual allegations, and draws all reasonable inferences in their favor.  *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).  "The court's review [of a Rule 12(b)(6) or Rule 12(c) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

- 2 -

facilities in Denton and Burleson, respectively, in 2019; that a representative of BioLife wrongly and negligently notified Carver that she had tested positive for HIV and had been placed on the National Donor Deferral Registry ("NDDR"),[3] despite the fact that the BioLife representative knew that Carver's test was not accurate but was, instead, a false positive; and that a BioLife representative notified Richie that he had tested positive for HIV and reported Richie's screening results to third parties, including the NDDR, even though confirmatory testing done by BioLife proved that the initial false-positive screening was incorrect.

Plaintiffs allege that plaintiff Jackson donated plasma at defendant CSL's Dallas location in November 2017 and that CSL notified Jackson that she had tested positive for HIV and had been placed on the NDDR, even though Jackson presented subsequent test results to CSL indicating that she does not have HIV.

Plaintiffs allege that plaintiff Anderson donated plasma at defendant Octapharma's Grand Prairie location in January 2019, that plaintiff Baskett donated plasma at Octapharma's Garland location in September 2018, and that plaintiff Seals donated plasma at Octapharma's Garland location in November or December 2015. Plaintiffs assert that Anderson and Baskett were wrongly or negligently notified that they had tested positive for HIV and that they had been placed on the NDDR, even though Anderson and Baskett both presented subsequent test results indicating that they do not have HIV. Plaintiffs allege that

_____

[3]Plaintiffs describe the NDDR as "a national registry of donors who failed testing and [are] banned permanently from donating plasma at any plasma donation center in the nation." 3d Compl. ¶ 26.

- 3 -

Octapharma wrongly and negligently notified Seals that he had tested positive for Hepatitis C, and that he and his wife, plaintiff Holt, had been placed on the NDDR, even though Seals presented subsequent test results indicating that he does not have Hepatitis C.

Plaintiffs allege that plaintiff Griggs donated plasma at defendant ImmunoTek's Dallas location in January 2019 and that ImmunoTek wrongly and negligently notified Griggs that he had tested positive for HIV and that he had been placed on the NDDR. Griggs has presented subsequent test results to ImmunoTek indicating that he does not have HIV.

On September 27, 2019 plaintiffs brought this lawsuit against Octapharma, CSL, ImmunoTek, and BioLife, alleging in their third amended complaint the following claims under Texas law: negligence; violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (West 2011 & Supp. 2018); defamation; tortious interference; conspiracy to commit tortious interference; breach of contract; fraud; violation of privacy rights; and declaratory judgment.[4] In *Anderson I* the court granted in part and denied in part BioLife's motion to dismiss the second amended complaint, but it also granted plaintiffs leave to file a third amended complaint.[5] BioLife now moves to dismiss the third amended complaint under Rules 12(b)(6) and 9(b), and Octapharma, CSL, and ImmunoTek move under Rule 12(c) for judgment on the pleadings.

---

[4]Plaintiffs assert their conspiracy claim against all defendants, but they bring their other claims only against the defendant that owns the facility where they donated plasma. *See* 3d Compl. ¶¶ 20-27.

[5]The court also granted plaintiffs' unopposed motion for leave to join Richie as a party plaintiff.

(For ease of reference, the court will sometimes refer to the motions for judgment on the pleadings as motions to dismiss.)  Plaintiffs oppose the motions.[6]

## II

The standard for deciding a motion for judgment under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6).  *See, e.g., Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n.8 (5th Cir. 2002) ("A number of courts have held that the standard to be applied in a Rule 12(c) motion is identical to that used in a Rule 12(b)(6) motion." (citation and internal quotation marks omitted)).  Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive defendants' motions, plaintiffs must allege enough facts "to state a claim to relief that is plausible on its

---

[6]Certain filings related to these motions do not comply with N.D. Tex. Civ. R. 7.1(i)(1) and 7.2(e).  Rule 7.1(i)(1) provides that "[a] party who relies on materials—including depositions, documents, electronically stored information, affidavits, declarations, stipulations, admissions, interrogatory answers, or other materials—to support or oppose a motion must include the materials in an appendix."  Rule 7.2(e) states that "[i]f a party's motion or response is accompanied by an appendix, the party's brief must include citations to each page of the appendix that supports each assertion that the party makes concerning any documentary or non-documentary materials on which the party relies to support or oppose the motion."  Because some of the evidentiary filings (e.g., declarations) are not included in a correctly paginated appendix and cited by specific appendix page number, it has been necessary for the court to devote unnecessary time locating these materials in the record.  Future filings in this case must comply with the local civil rules.  Rules 7.1(i)(1) and 7.2(e), for example, enable the court to decide motions more efficiently and therefore benefit the court and parties alike.

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)).  Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "labels and conclusions."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And "a formulaic recitation of the elements of a cause of action will not do."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

"Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud."  *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013) (per curiam).  "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well

as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (quoting *Benchmark Elecs.*, 343 F.3d at 724). More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

III

The court begins with plaintiffs' DTPA claim. BioLife moves to dismiss this claim on the ground that plaintiffs are not "consumers," as required by the statute. CSL, Octapharma, and ImmunoTek move for judgment on the pleadings on similar grounds.[7]

A

Under the DTPA, consumers have a cause of action for false, misleading, or deceptive acts or practices. *See* Tex. Bus. & Com. Code Ann. § 17.50(a)(1). A "consumer" is an "individual . . . who seeks or acquires by purchase or lease, any goods or services[.]" *Id.* § 17.45(4). There are two requirements for consumer status. "First, the person must seek or acquire goods or services by lease or purchase." *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 159 (Tex. App. 2007, pet. denied) (citing Tex. Bus. & Com. Code Ann. § 17.45(4)). "Second, the goods or services sought or acquired must form the basis of the party's complaint." *Id.* (citing *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351-52 (Tex. 1987)). "The question of whether a plaintiff is a consumer under the DTPA is a question of

---

[7]Defendants' motions differ somewhat from each other, but the differences are immaterial.

law for the trial court." *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135, 139 (Tex. App. 1995, writ denied). "If the purchasers are not consumers, then they have no standing under the act. Only consumers may recover under Tex. Bus. & Com. Code § 17.50(a)." *Chastain v. Koonce*, 700 S.W.2d 579, 581 (Tex. 1985).

B

In *Anderson I* the court held that plaintiffs' allegation that Carver had donated plasma to BioLife failed to plausibly plead that she had purchased or sought to purchase a good or service from BioLife. *Anderson I*, 2020 WL 1083608, at *5. The court observed in a footnote that, even if it were inclined to agree that BioLife generally provides a service by supplying necessary trained personnel and medical equipment to accomplish the goal of assisting those who wish to provide plasma for medical use, plaintiffs had not plausibly alleged that Carver or any other plaintiff purchased or otherwise exchanged valuable consideration for that service. *Id.* at *5 n.6.

In their third amended complaint, plaintiffs attempt to remedy the defects identified in *Anderson I* by alleging, in pertinent part, that they "are consumers in that they acquire money by selling or otherwise providing their plasma to Defendants for consideration (payment of money), and those goods or services form the basis of the instant complaint." 3d Compl. ¶ 42. Plaintiffs also assert that

> Defendants, including BioLife, pay donors, like Plaintiffs, to donate their plasma in order to turn that plasma into multimillion dollars' worth of medicines and products that Defendant BioLife cannot produce without the donations they solicit. Donors cannot simply sell or drop off a sample of their blood to

- 8 -

> pharmaceutical companies or manufacturers of plasma/blood products, nor are they able to separate the plasma from their blood without the aid of plasmapheresis which is provided by Defendants, including BioLife, as a service to its donors.  To that end, donors are seeking a service that Defendant BioLife is providing and are compensated for the donations they make.

*Id.* ¶ 44.

C

To the extent plaintiffs contend that they are "consumers" under the DTPA because they acquire money in exchange for their plasma, the court disagrees with their position.  The DTPA defines "goods" as "tangible chattels or real property purchased or leased for use." Tex. Bus. & Com. Code Ann. § 17.45(1).  It defines "services" as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods."  *Id.* § 17.45(2).  It is clear that money is neither a "good" nor a "service" under the DTPA.  *See, e.g., Davis v. Wells Fargo Bank, N.A.*, 976 F.Supp.2d 870, 886 (S.D. Tex. 2013) (noting, in context of DTPA claim, that "money is neither a good nor a service."); *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex. 1980) (holding that money is not a "good," as defined by the DTPA but, rather "money is properly characterized as a currency of exchange that enables the holder to acquire goods.").

Insofar as plaintiffs maintain that defendants provide them a "service"— i.e., the plasmapheresis process—in exchange for their donated plasma, the court holds that plaintiffs have failed to plausibly plead on this basis that they are consumers.  This is because what plaintiffs allege is a "service" does not qualify as such under the DTPA.  *See* Tex. Bus. &

Com. Ann. § 17.45(2) (defining "service" as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods").

In *Silguero v. CSL Plasma, Inc.*, 907 F.3d 323 (5th Cir. 2018), the Fifth Circuit considered, in the context of a claim brought under the Americans with Disabilities Act, whether a plasma collection center provides a "service" to its donors.  *Id.* at 329.  The panel began by exploring Congress's use of the word "service" in the phrase "service establishment," concluding that "the word 'service' . . . suggests not only that the establishment performed some action but also that the action helped or benefited the recipient."  *Id.* at 328.  The court then explained that, in the case of a plasma collection center,

> donors receive no obvious "benefit" or "help" which would make the plasma collection center's act a "service."  They are hooked up to a machine and drained of life-sustaining fluid, subjecting them to discomfort and medical risks.  Donors do not have the plasma earmarked for themselves or to aid a specific third party for whom they are concerned.  Instead, the plasma becomes the property of the plasma collection center to do with it whatever it pleases.  The labor is not "useful" to the donor; it is "useful" to the establishment.  The donor is benefi[t]ed only by the payment of money, which is wholly collateral to the act of plasma collection.  Thus, as plasma collection occurs in this case, the individual performs a service for the establishment, not the other way around.

*Id.* at 329.[8]

_____

[8] In response to Octapharma's and ImmunoTek's motions, plaintiffs rely on *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016), to maintain they are DTPA "consumers."  The Fifth Circuit, however, has clearly rejected the pertinent reasoning of *Levorsen.  See Silguero*, 907 F.3d at 329 ("We disagree with the Tenth Circuit, however,

- 10 -

*Silguero* persuasively teaches that, for an act to constitute a "service," the act must provide the recipient some kind of benefit.  Plaintiffs have failed to plausibly plead that, when they donate plasma to one of the defendants, they receive anything except money, which is wholly collateral to the plasmapheresis process.  As *Silguero* explains, and as this claim is pleaded, the plaintiffs are performing a service for the defendants, not the other way around.

But even if the court assumes *arguendo* that plaintiffs have adequately alleged that defendants provide a "service" under in the DTPA, they have not plausibly pleaded that they acquired the service "by purchase or lease," as Tex. Bus. & Com. Code Ann. § 17.45(4) requires.  Instead, as *Silguero* explains, and as plaintiffs have alleged, defendants *paid the plaintiffs* for their plasma donations.  *See* 3d Compl. ¶ 44 ("Defendants, including BioLife, pay donors, like Plaintiffs, to donate their plasma.").

Plaintiffs rely on *Arthur Anderson & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812 (Tex. 1997), and *Kennedy v. Sale*, 689 S.W.2d 890 (Tex. 1985), to argue that "the DTPA does not require the consumer to be an actual purchaser or lessor of the goods or services, as long as the consumer is the *beneficiary* of those goods or services." Ps. 6/1/20 Resp. 12 (citation omitted); *see also* Ps. 8/7/20 Resp. 11 (same).  But as the court has explained, plaintiffs have failed to plausibly plead that they are the "beneficiaries" of any services (or

_____

about whether plasma collection centers provide a 'service' to customers.").  And because *Levorsen* did not address whether plasma donors are "consumers" under the DTPA, Octapharma is not bound by the Tenth Circuit's "judicial determinations," Ps. 9/30/20 Resp. 17, in that case, and the doctrine of collateral estoppel does not apply.

goods) with respect to their plasma donations.  As alleged in the third amended complaint, the "beneficiaries" of plaintiffs' plasma donations are the defendants.  *See* 3d Compl. ¶ 44 ("Defendants, including BioLife, pay donors, like Plaintiffs, to donate their plasma in order to turn that plasma into multimillion dollars' worth of medicines and products that Defendant BioLife cannot produce without the donations they solicit.").[9]

Accordingly, because plaintiffs have failed to plausibly plead that they are consumers under the DTPA, the court grants defendants' motions as to plaintiffs' DTPA claim and dismisses that claim with prejudice.

IV

The court now considers defendants' motions to dismiss plaintiffs' claim for negligence in testing their plasma samples and reporting false-positive test results to third parties.[10]

_____

[9]Plaintiffs' briefing similarly supports this conclusion. *See, e.g.,* Ps. 6/1/20 Resp. 12 ("Here, BioLife and the other Defendants solicit plasma donors in a variety of ways including radio advertisements and Facebook advertisements, offering them cash for plasma donations. Defendant BioLife and the others then use that donated plasma to make medicines at a significant profit.  The profits for those medicines are then used by BioLife to lure in more victims with the promise of cash."); Ps. 8/7/20 Resp. 12 ("CSL solicited plasma donors in a variety of ways including radio advertisements and Facebook advertisements, offering them cash for plasma.  Defendant CSL then uses that donated plasma to make products thereafter sold at a significant profit.  The profits for those medicines are then used by CSL to lure in more victims with the promise of cash.").

[10]*See Anderson I*, 2020 WL 1083608, at *6 (differentiating between plaintiffs' negligence claim insofar as based on allegedly negligent reporting of erroneous test results and allegedly negligent processing of donated plasma).

A

Before turning to the merits of plaintiffs' negligence claim, the court addresses plaintiffs' objections to the various documents—informed consents, privacy statements, and information sheets (collectively, "Consent Forms")—that defendants cite in support of their motions.

Defendants maintain that, prior to donating plasma, each plaintiff read and signed the Consent Forms provided to him or her, and that these Consent Forms provide, in pertinent part, that the plasma collection company will perform a screening test to determine whether donors are eligible to donate plasma; it is possible that the screening test will produce a false positive result, which means the test result is positive but the donor does not actually have the infection; positive or reactive screening results (including false-positive results) will mean that the donor can no longer donate plasma or blood; and if a donor tests positive or reactive for HIV or Hepatitis C, the donor's name will be added to the NDDR.  Plaintiffs object to the court's consideration of the Consent Forms on the ground, *inter alia*, that the court is not permitted to consider these documents in deciding a motion under Rule 12(b)(6) or Rule 12(c).

In deciding a motion under Rule 12(b)(6) or Rule 12(c), the court is permitted to consider "any documents attached to the motion . . . that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *see also Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).  "A document is central to a claim when it is 'necessary to establish an

element' of the claim." *Pylant v. Cuba*, 2015 WL 12753669, at *2 (N.D. Tex. Mar. 6, 2015) (Solis, J.) (quoting *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011)); *see also Collins*, 224 F.3d at 498-99 (explaining that courts may consider such documents because "[i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated"). But "if the operative pleading references a document that is merely evidence of an element of a claim, the courts do not incorporate it into the pleading." *O'Malley v. Brown Bros. Harriman & Co.* 2020 WL 1033658, at *3 (W.D. Tex. Mar. 3, 2020) (internal quotation marks omitted) (quoting *Pylant*, 2015 WL 12753669, at *2); *see also Lopez v. Don Herring Ltd.*, 2018 WL 296063, at *4 (N.D. Tex. Jan. 4, 2018) (Boyle, J.) (same).

Plaintiffs reference the Consent Forms in the third amended complaint when they allege that they

> did not knowingly consent to Defendants' negligent and knowing reporting of false results. Neither did Plaintiffs consent to being placed permanently on a banned donors list based on false information propagated solely by Defendants. These lengthy screens of information were supposedly placed in front of Plaintiffs electronically and without explanation as to what Plaintiffs are consenting to. Plaintiffs were not aware that the negligence of Defendants could produce erroneous results and based on the negligent reporting of the erroneous results, that based on erroneous information Plaintiffs would be reported and placed permanently on a list of banned and stigmatized donors without any recourse to remove or clear their name.

3d Compl. ¶ 39. But the Consent Forms are not "central" to plaintiffs' negligence claim

because they are not "necessary to establish" any of the essential elements of the claim. *See, e.g., QSL Waco, Inc. v. Lube Holdings, Inc.*, 2017 WL 3405039, at *3 (E.D. Tex. July 10, 2017) ("Here, the franchise agreement is not central to Plaintiffs' claims because it is not necessary to establish an element of any of their claims. . . . Plaintiffs could conceivably prove their fraud-related and negligence claims without ever mentioning the franchise agreement.").[11]  In fact, as set out in their motions, defendants rely on these forms solely as a *defense* to plaintiffs' negligence claim.  Accordingly, the court will not consider them in deciding whether to dismiss plaintiffs' negligence claim. *See, e.g., Goodman v. Asus Computer Int'l*, 2017 WL 2671177, at *2 (S.D. Tex. May 30, 2017) ("The license agreements are not 'central' to Plaintiff's claim . . . because they are not 'necessary to establish' any of the essential elements of patent infringement; on the contrary, licenses to a patent provide an affirmative defense to a claim of infringement."), *rec. adopted*, 2017 WL 2672645 (S.D. Tex. June 19, 2017); *In re Think3, Inc.*, 529 B.R. 147, 170 (Bankr. W.D. Tex. 2015) ("[A] document which is 'central' to a plaintiff's claim does not apply to documents that support affirmative defenses.").[12]

_____

[11]Because the court concludes that the Consent Forms are not "central" to plaintiffs' negligence claim (and, below, plaintiffs' defamation claim, *see infra* § V(E)), it need not address plaintiffs' other objections to these documents.

[12]*Anderson I*—in which the court dismissed Carver's negligent reporting claim on the ground that she had expressly consented to the reporting of tests that contained false positives, *Anderson I*, 2020 WL 1083608, at *6—is not to the contrary.  In *Anderson I* the court noted that BioLife relied on Carver's *declaration*, which was attached to the second amended complaint and was properly considered in deciding BioLife's motion to dismiss. *See id.* at *6 n.10.  And plaintiffs failed in the second amended complaint (unlike in the third amended complaint) to allege that they did *not* consent to defendants' disclosure of their false

B

The court now turns to the substance of plaintiffs' negligence claim, beginning with negligent reporting.

1

To the extent that defendants move to dismiss plaintiffs' negligent reporting claim on the ground that plaintiffs consented to the reporting of false-positive test results to the NDDR and other third parties, the court denies the motions. As quoted above, plaintiffs allege that they "did not knowingly consent to Defendants' negligent and knowing reporting of false results" and did not "consent to being placed permanently on a banned donors list based on false information propagated solely by Defendants." 3d Compl. ¶ 39. These allegations, which the court must accept as true, are sufficient to plausibly plead that plaintiffs did *not* consent to defendants' reporting false positive test results to third parties, including the NDDR. Accordingly, defendants are not entitled to dismissal of plaintiffs' negligent reporting claim on the ground that plaintiffs consented to the reporting of tests that contained false positives.

2

To the extent that CSL, Octapharma, and ImmunoTek[13] move to dismiss plaintiffs' negligent reporting claim on the ground that plaintiffs do not dispute that their test results

positive test results to third parties such as the NDDR. Nor did they specifically object to the court's consideration of the consent forms in deciding BioLife's motion to dismiss the second amended complaint.

[13]BioLife does not move to dismiss the third amended complaint on this ground.

- 16 -

were "reactive," the court grants these defendants' motions.

Under Texas law, the "elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Preliminarily, the court notes that it is unclear from the third amended complaint what "duty" plaintiffs maintain defendants breached. Plaintiffs allege that defendants owed them a duty "not to erroneously report [their test] results without retesting or obtaining and testing a second sample." 3d Compl. ¶ 36. But they fail to point to any authority, and the court has found none on its own, that would require defendants to retest plaintiffs' samples or obtain and test second samples before reporting reactive test results to third parties, including the NDDR.[14]

Assuming *arguendo* that defendants owed donors a duty "not to erroneously report" screening results to third parties, including the NDDR, plaintiffs have not plausibly alleged that defendants' conduct breached that duty. In the third amended complaint, plaintiffs allege that defendants notified each donor-plaintiff that the donor had tested positive for HIV or Hepatitis C; that the donor-plaintiffs' names were placed on the NDDR; and that plaintiffs

_____

[14]Even if, under federal regulations, defendants were required to retest plaintiffs' plasma sample, *see, e.g.*, 21 C.F.R. § 610.40(e) ("You must further test each donation . . . found to be reactive by a donor screening test . . . using a licensed, approved, or cleared supplemental test, when available. If no such supplemental test is available, you must perform one or more licensed, approved, or cleared tests as adequate and appropriate to provide additional information concerning the reactive donor's infection status."), there is no requirement that such retesting be performed *before* reactive screening results are reported to third parties.

- 17 -

presented subsequent test results indicating that they do not in fact have HIV or Hepatitis C. *See* 3d Compl. ¶¶ 20-25. But plaintiffs do *not* plausibly allege, nor do they argue in their response briefs, that what defendants actually reported to the NDDR—i.e., plaintiffs' positive screening results—was erroneous. As Octapharma explains in its brief, "a subsequent negative *diagnostic* test for an infectious disease does not render a reactive or positive *screening* test false." Octapharma 8/21/20 Mot. 1. Accepting as true plaintiffs' allegation that they later established that their initial screening test results were false positives, plaintiffs do not dispute that they *did*, in fact, initially test positive for HIV or Hepatitis C. Defendants could not have breached an alleged duty not to erroneously report test results to third parties, including the NDDR, by accurately reporting their donors' initial screening results.[15] Accordingly, the court grants the motions for judgment of CSL, Octapharma, and ImmunoTek as to plaintiffs' claim for negligent reporting.

---

[15]To the extent plaintiffs allege, in support of their *defamation* claim, that defendants reported plaintiffs' false positive screening results "as positive test results (without disclosing the known negative test results)," 3d. Compl. ¶ 51, the court has previously held (making a prediction under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)) that "a plaintiff 'cannot maintain a negligence claim based solely on a duty not to defame.'" *Charalambopoulos v. Grammar*, 2015 WL 390664, at *22 (N.D. Tex. Jan. 29, 2015) (Fitzwater, J.) (quoting *Oliphant v. Richards*, 167 S.W.3d 513, 518 (Tex. App. 2005, pet. denied)). Thus to the extent plaintiffs' negligence claim is based on the same conduct as their defamation claim, the court holds that plaintiffs' negligence claim is "not viable as a matter of law." *Id.* (dismissing plaintiff's negligence claims under the Texas Citizens' Participation Act).

3

The court raises *sua sponte* that defendant BioLife is entitled to dismissal of Carver's and Richie's negligent reporting claim on this same ground.[16]   In the third amended complaint, plaintiffs allege that BioLife reported Carver's and Richie's false-positive test results to the NDDR.  But they do not allege, either in their third amended complaint or in their response to BioLife's motion to dismiss, that Carver and Richie did not actually test reactive for HIV or that the test results that BioLife reported—i.e., their reactive test results—were the actual test results.  In other words, because it is undisputed that Carver and Richie actually tested reactive for HIV, BioLife's reporting these test results could not have been negligent.  The court therefore raises *sua sponte* that BioLife is entitled to dismissal of Carver's and Richie's negligent reporting claim, and it permits plaintiffs to file an opposition response, as set out *infra* at § XIII.

C

The court next considers plaintiffs' claim for negligent testing.[17]

---

[16]A district court has the authority to consider the sufficiency of a complaint and dismiss an action *sua sponte*, as long as the procedure it employs is fair.  *See, e.g., Biggers v. BAC Home Loans Servicing, LP*, 767 F.Supp.2d 725, 733-34 n.7 (N.D. Tex. 2011) (Fitzwater, C.J.) (noting that district court has authority to consider sufficiency of complaint and dismiss action on its own motion as long as procedure employed is fair, raising ground for dismissal *sua sponte*, and concluding that procedure was fair because court was granting leave to replead).  Because the court is permitting plaintiffs to respond to this ground for dismissal, *see infra* § XIII, the procedure employed here is fair.

[17]Although plaintiffs allege negligence in obtaining, handling, processing, and testing plaintiff's donations, *see* 3d Compl. ¶ 36, the court for ease of reference will refer to this claim as one for "negligent testing."

- 19 -

1

As stated above, under Texas law, the elements of a negligence claim are the existence

of a legal duty, a breach of that duty, and damages proximately caused by the breach.  *IHS*

*Cedars Treatment Ctr. of DeSoto, Tex*, 143 S.W.3d at 798.  "The threshold inquiry in a

negligence case is whether the defendant owes a legal duty to the plaintiff."  *Centeq Realty,*

*Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).  "The existence of duty is a question of law

for the court to decide from the facts surrounding the occurrence in question."  *Id.*

> The question of legal duty is a multifaceted issue requiring [the
> court] to balance a number of factors such as the risk and
> foreseeability of injury, the social utility of the actor's conduct,
> the consequences of imposing the burden on the actor, and any
> other relevant competing individual and social interests
> implicated by the facts of the case.

*Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002) (citations omitted).

"Although the formulation and emphasis varies with the facts of each case, three categories

of factors have emerged: (1) the relationship between the parties; (2) the reasonable

foreseeability of harm to the person injured; and (3) public policy considerations."  *Id*. at 34

(citations omitted).

CSL moves for judgment on the pleadings with respect to plaintiffs' negligent testing

claim on the ground, *inter alia*, that it did not owe Jackson a duty to properly test her blood

sample for communicable diseases.[18]  In the third amended complaint, plaintiffs make the

---

[18]Octapharma raises this argument in its reply brief.  *See* Octapharma 10/14/20 Reply
6-7 ("[W]hile in the Response Plaintiffs present a list of alleged 'duties' that Octapharma
supposedly owed and breached (with no legal support for same), the Complaint does not

conclusory assertion that CSL "owed a duty to Plaintiffs to obtain, handle, and process their blood donations and to test them with reasonable care to get accurate results." 3d Compl. ¶ 36. But as CSL points out, plaintiffs "cite[] no Texas legal authority for the proposition that a plasma collection center, which collects donated Source Plasma for its own purposes, owes a duty to the donor regarding the presence of a virus or other communicable disease in the sample."[19] CSL 8/21/20 Reply 8. Although in their response brief plaintiffs expand the list of duties they maintain they were owed,[20] they still fail to provide any basis for them in

contain any such allegations against Octapharma."). Although the court typically declines to consider arguments raised for the first time in a reply brief, *see, e.g., Jacobs v. Tapscott*, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.), because the court is raising this ground for dismissal *sua sponte*, it will address whether Octapharma is entitled to dismissal on the negligent testing claim on this basis.

[19]Nor have plaintiffs pleaded a basis in Texas law for their allegation that, because defendants were aware that a percentage of their testing produced false positive results, they owed their donors a duty to "re-test or to obtain and test a second sample to ensure accurate results." 3d Compl. ¶ 38. To the extent that plaintiffs intended to rely on 21 C.F.R. § 610.40(e), which requires "further testing" of each donation found to be reactive by a donor screening test, plaintiffs do not plausibly allege that any of the defendants failed to comply with the requirements of § 610.40(e).

[20]Plaintiffs posit:

> Defendant CSL owed a duty to Plaintiff Jackson to obtain, handle, process, ship, and test Plaintiffs' donations with reasonable care to ensure accurate results, to use the proper techniques and procedures, to use the proper equipment, to use non-defective test kits, to avoid contamination of the samples, to timely conduct the tests, and not to erroneously or intentionally report erroneous results, and to correct the records when known to be wrong. Defendant breached these duties, resulting in inaccurate and false results, which were the proximate cause of the false-positive screening, negligent disclosure of same, and damages to Plaintiff.

- 21 -

Texas law.  Because plaintiffs have failed to demonstrate that, under Texas law, plasma collection centers owe donors a duty to obtain, handle, process, and test blood donations with reasonable care, the court concludes that CSL is entitled to judgment dismissing plaintiffs' negligent testing claim.[21]

To the extent that BioLife, Octapharma, and ImmunoTek have not clearly raised this ground for dismissing plaintiffs' negligent testing claim, the court raises it *sua sponte* and permits plaintiffs to file an opposition response, as set out *infra* at § XIII.

2

Alternatively, assuming *arguendo* that, under Texas law, plasma collection companies do owe donors a duty of reasonable care with respect to testing plasma donations for evidence of communicable disease, plaintiffs have not plausibly alleged that defendants' conduct breached that duty: i.e., that they acted negligently.  In the third amended complaint, plaintiffs make the conclusory allegation that "defendants breached the[] duties [listed in ¶ 36,] which led to tainted and/or false results."  3d. Compl. ¶ 36.  But this conclusory assertion is insufficient of itself to plausibly plead the breach element of a negligence cause of action. Based solely on the fact that their screening tests resulted in false positive results, plaintiffs are essentially asking the court draw the inference that defendants must have acted with

---

Ps. 8/7/20 Resp. 9.

[21]This conclusion is not inconsistent with *Anderson I*.  In *Anderson I* BioLife only argued that "Carver fails to establish the existence of a legal duty that a plasma collection facility may not defer, or report, donors with reactive results."  BioLife 12/16/19 Mot. to Dis. at 9 (emphasis omitted).  BioLife did not argue that there was no duty of care with respect to obtaining, handling, and processing plasma donations.

negligence.  In fact, plaintiffs attempt to plead their negligence claim under an alternative *res ipsa loquitur* theory, alleging that "Defendants took control of Plaintiffs' blood samples and if handled, processed and tested properly without negligence, would not have led to the inaccurate results and damages to Plaintiffs."  3d Compl. ¶ 40.  But the allegations of the third amended complaint do not enable the court to draw the reasonable inference that false positive test results can only occur when tests are negligently performed.  Therefore, based on plaintiffs' false positive test results alone, the court cannot reasonably infer that defendants acted negligently when testing, handling, and processing plaintiffs' blood samples.  The court grants CSL's, ImmunoTek's, and Octapharma's motions to dismiss plaintiffs' negligent testing claim on the alternative ground that plaintiffs have failed to plausibly allege the breach of a legal duty—i.e., that these defendants acted negligently.[22]

The court raises *sua sponte* that BioLife is entitled to a dismissal of plaintiffs' negligent testing claim on this same alternate ground, and it permits plaintiffs to file an opposition response, as set out *infra* at § XIII.

_____

[22]Relying on language in their Consent Forms, defendants BioLife, CSL, and ImmunoTek also move to dismiss plaintiffs' claim for negligent testing on the ground that plaintiffs consented to testing that resulted in false positives, including under circumstances that did not preclude defendants' error.  But as explained above, *see supra* § IV(A), the court will not consider the Consent Forms in deciding defendants' motions because these documents are not central to plaintiffs' negligence claim.  Accordingly, the court denies BioLife's, CSL's, and ImmunoTek's motions to dismiss plaintiffs' negligent testing claim to the extent based on plaintiffs' alleged consent.

- 23 -

V

The court next considers plaintiffs' defamation claim.

A

> In a suit by a private person against a non-media defendant in connection with a matter that is not of public concern, the elements of a defamation claim are (1) the publication of a statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. Under these circumstances, i.e., a private-individual defamation action against a non-media defendant, the falsity of the defamatory statement is generally presumed, and the truth of the statement is an affirmative defense that must be proved by the defendant.

*Anderson I*, 2020 WL 1083608, at *7 (footnote and citations omitted). The court held in

*Anderson I* that it was clear from the face of the second amended complaint that the

information BioLife published to the NDDR—i.e., Carver's initial reactive results—was true,

and that BioLife was therefore entitled to dismissal of Carver's defamation claim. *Id.*

In the third amended complaint, plaintiffs

> specifically allege that Defendants published false statements about Plaintiffs without consent. Defendants' accusations that Plaintiffs tested positive for infectious diseases were false and Defendants knew that the screenings were false-positives, yet wrongfully published them anyway as positive test results when they were not, and Plaintiffs did not consent to such publication of false screenings. When Defendants published the false screenings, they knew they were false at the time (having negative test results) and reported them as positive test results (without disclosing the known negative test results), wrongfully including Plaintiffs on a list of stigmatized persons with "positive" test results.

3d Compl. ¶ 51.

- 24 -

B

BioLife moves to dismiss Carver's and Richie's defamation claim, contending that they have failed to allege that their test results in fact were not reactive, even though the results were later determined to be false positives, and that plaintiffs therefore cannot plausibly allege that BioLife's statements regarding their initial tests were false; plaintiffs cannot show that the statements were defamatory in the context in which they were made because all third parties to which the results were allegedly communicated would have understood that a reactive screening test is not a diagnosis; and Carver and Richie expressly consented to the conduct they now allege is defamatory.

CSL moves to dismiss Jackson's defamation claim, arguing that Jackson consented to the allegedly defamatory statements; that the statements were required under federal law, i.e., 21 C.F.R. 610.41(a); that Jackson has failed to allege that her initial HIV screen in fact was not reactive for HIV; and that because the information reported to the NDDR was true, CSL is entitled to dismissal of Jackson's defamation claim.

Octapharma moves to dismiss the defamation claim asserted against it on the ground that the information that was published, i.e., the fact that plaintiffs had a reactive screening result, was true.  It also moves to dismiss the defamation claim brought by Holt on the ground that no test result of Holt's was reported to the NDDR or other plasma companies and that plaintiffs have therefore failed to plausibly allege that any false statement (or any statement at all) concerning Holt was published to a third party.

ImmunoTek moves to dismiss Griggs's defamation claim on the grounds that he has

failed to allege that his initial screening test was *not* reactive for HIV and does not contend that ImmunoTek falsely reported the initial screen result; ImmunoTek is required by law to record reactive or positive screening tests; and Griggs consented to ImmunoTek's reporting any positive or reactive results and listing his name on the NDDR in the event of positive or reactive test results.

Plaintiffs respond that defendants falsely published to their competitor plasma collection companies (and other third parties) that plaintiffs had tested positive for HIV or Hepatitis C, when that was not true; that defendants knew that plaintiffs were not HIV positive or positive for Hepatitis C before publishing such false information; that defendants negligently disclosed false-positive screening results and then refused to correct the record or remove plaintiffs as falsely stigmatized donors from the NDDR; that 21 C.F.R. § 610.40(e) requires that defendants further test plaintiffs' samples, but defendants falsely reported the false positive results with full knowledge that they were false positive results before they conducted any further testing, as required by § 610.40(e); that whether plaintiffs consented to the alleged defamation is a factual dispute that cannot be resolved at the pleading stage; that defendants defamed them by falsely disclosing confidential medical information, i.e., inaccurate lab test results, to other plasma donation companies in the Dallas area, that falsely stigmatized them and was the direct cause of plaintiffs' inability to donate plasma anywhere else; and that accusing plaintiffs of having an offensive, even deadly, disease is defamation *per se*.

C

Plaintiffs have failed to plausibly allege that Octapharma published any defamatory statement regarding Holt.  In the third amended complaint, they allege only that Holt was notified "that she had been banned permanently from donating plasma at any plasma donation center in the nation because her husband . . . had allegedly tested positive for Hepatitis C."  3d Compl. ¶ 25.  This allegation is insufficient to plausibly plead that Octapharma published a defamatory statement with respect to Holt.  And plaintiffs have not responded to Octapharma's contention that Holt's name in fact was never placed on the NDDR or reported to other plasma collection companies.  Accordingly, the court dismisses the defamation claim that Holt asserts against Octapharma.

D

As for the remainder of plaintiffs' defamation claim, the court held in *Anderson I*, based on Carver's declaration, that BioLife's reporting her "reactive" test results did not constitute defamation because Carver failed to allege that her initial results in fact were not "reactive."  *Anderson I*, 2020 WL 1083608, at *7.  Plaintiffs still do not dispute that they in fact *did* test reactive for HIV or Hepatitis C, at least initially, and that defendants' reporting of these test results was literally true.  Instead, plaintiffs now appear to allege that the test results reported to the NDDR and other third parties were "false statements" because defendants reported plaintiffs' false-positive test results "as positive test results (without

disclosing the known negative test results)." 3d Compl. ¶ 51.[23]  In their responses to

defendants' motions to dismiss, plaintiffs argue, *inter alia*:

> Plaintiffs allege in their Third Amended Complaint that
> Defendant[s] falsely published to [their] competitor plasma
> collection companies (and other third parties) that Plaintiffs
> tested positive for HIV, when that was not true.  Indeed,
> Defendant[s] knew that Plaintiffs were not HIV positive before
> publishing such false information.  This conduct constituted
> [defamation] per se.

Ps. 6/1/20 Resp. 18; *see also* Ps. 8/7/20 Resp. 16-17.

Although in Texas substantial truth is an affirmative defense to a defamation claim,

it is not an absolute defense.  In *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000),

the Supreme Court of Texas held that "under Texas law a publication can convey a false and

defamatory meaning by omitting or juxtaposing facts, even though all the story's individual

statements considered in isolation were literally true or non-defamatory." *Id*. at 114.  Thus

"a plaintiff can bring a claim for defamation when discrete facts, literally or substantially

true, are published in such a way that they create a substantially false and defamatory

impression by omitting material facts or juxtaposing facts in a misleading way." *Id.* at 115.

Consequently, the literal truth of each individual statement is not a defense when there is an

omission of material facts or a misleading presentation of true facts that can render an

---

[23]BioLife contends in its reply that Carver's and Richie's "reactive screening test results were all that was communicated, not any actual purported HIV status."  BioLife 6/15/20 Reply 6.  To the extent this assertion contradicts the allegations of the third amended complaint, the court must accept the allegations of the third amended complaint as true when deciding defendants' motions to dismiss.

account just as false as an outright misstatement.  *See id.*

Plaintiffs allege that defendants published to their competitor plasma companies and other third parties that plaintiffs had tested positive for HIV or Hepatitis C when, at the time of the alleged publication, they knew in fact that plaintiffs had *not* tested positive for these diseases but, instead, had received false-positive screening results.[24]  These allegations are sufficient at the pleading stage to preclude defendants' motions to dismiss based on the affirmative defense of truth.

E

Nor are defendants entitled to a dismissal of plaintiffs' defamation claim on the other grounds on which they rely.  BioLife, CSL, and ImmunoTek move to dismiss plaintiffs'

---

[24]There is some inconsistency between the third amended complaint and the attached declarations.  The third amended complaint specifically alleges that, "[w]hen Defendants published the false screenings, they knew they were false at the time (having negative test results)."  3d Compl. ¶ 51.  In the attached declarations, some of the plaintiffs aver that their reactive results were reported to the NDDR *before* later testing confirmed that these results were, in fact, false positives.  *See, e.g.,* Ps. 6/1/20 Resp. Ex. H at ¶ 8 (averring that Carver was independently retested for HIV "[a]s a result" of BioLife's placing her name on the NDDR); Ps. 6/1/20 Resp. Ex. I at ¶¶ 8-9 ("I went back to [BioLife] after receiving the test results from Dr. Dunn to show BioLife that I was not, in fact, positive for the HIV virus," but "when I asked that my name be taken off the [NDDR], he refused, stating that I supposedly could not be taken off the list."); Ps. 8/7/20 Resp. Ex. L at ¶ 7 ("*After obtaining the negative results from the independent lab work*, I went back to CSL to inquire as to whether I could resume plasma donations and be taken off the [NDDR], but to my surprise, I was told by a CSL representative, that they would not take action to remove me from the national database or anything else to clear me." (emphasis added)).  Nevertheless, because in deciding defendants' motions the court must accept as true all well-pleaded factual allegations and view them in the light most favorable to plaintiffs, the court will accept the allegation in ¶ 51 of the third amended complaint and leave for determination at a later appropriate stage the question whether defendants learned that plaintiffs' reactive screening results were false positives *after* they had already published the test results.

defamation claim on the ground that plaintiffs consented to the allegedly defamatory statements. But for the reasons explained above, *see supra* § IV(A), the court will not consider the Consent Forms in deciding defendants' motions because the Consent Forms are not central to establish an element of plaintiffs' defamation claim. *See Pylant*, 2015 WL 12753669, at *2.[25] This is especially the case where, as here, plaintiffs specifically allege that they did *not* consent to the allegedly defamatory publication. *See* 3d Compl. ¶ 51 ("Plaintiffs did not consent to such publication of false screenings.").

BioLife moves to dismiss on the ground that all third parties to which the results were allegedly communicated would have understood that a reactive screening test is not a diagnosis. But the question of how a third party would interpret plaintiffs' alleged "positive" test results is one of fact that cannot be resolved at the pleading stage. Accordingly, Biolife is not entitled to dismissal of plaintiffs' defamation claim on this ground.

Finally, the court rejects the argument that federal law required defendants to report plaintiffs' false-positive screening results.[26] CSL cites 21 C.F.R. § 610.41(a) for the proposition that the allegedly defamatory statements "were required by federal regulations." CSL 6/18/20 Mot. 10. But 21 C.F.R. § 610.41(a) requires only the *deferral* of donors who

---

[25]"In a suit by a private person against a non-media defendant in connection with a matter that is not of public concern, the elements of a defamation claim are (1) the publication of a statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *Anderson I*, 2020 WL 1083608, at *6 (footnote and citations omitted).

[26]This conclusion is based on the current briefing and is subject to modification if defendants can later demonstrate that their assertion is correct.

test reactive; it does not expressly obligate plasma collection companies to publish reactive screening results to third parties. *See* 21 C.F.R. § 610.41(a) (stating that "an establishment that collects human blood or blood components, must *defer* donors testing reactive by a screening test for evidence of infection due to a relevant transfusion-transmitted infection(s) under § 610.40(a), from future donations of human blood and blood components," (emphasis added), unless certain exceptions apply). ImmunoTek argues that it was required by law to record reactive or positive screening tests under 21 C.F.R. § 606.160(e)(1). But like § 610.41(a), nothing in § 606.160(e)(1) explicitly requires establishments like defendants to report reactive screening results to third parties. *See* 21 C.F.R. § 606.160(e)(1) ("Establishments must maintain at each location a record of all donors found to be ineligible or deferred at that location so that blood and blood components from an ineligible donor are not collected and/or released while the donor is ineligible or deferred.").

The court therefore declines to dismiss plaintiffs' defamation claim in the context of motions made under Rules 12(b)(6) and 12(c), except as to Holt's claim against Octapharma.

## VI

Because the court is declining to dismiss Seals's defamation claim against Octapharma on the grounds discussed in § V, the court now addresses Octapharma's contention that Seals's claim is barred by the Texas one year statute of limitations.

## A

Limitations is an affirmative defense. *See* Rule 8(c)(1). To obtain a dismissal based on an affirmative defense, the "successful affirmative defense [must] appear[] clearly on the

face of the pleadings." *Cochran v. Astrue*, 2011 WL 5604024, at *1 (N.D. Tex. Nov. 17, 2011) (Fitzwater, C.J.) (quoting *Sivertson v. Clinton*, 2011 WL 4100958, at *2 (N.D. Tex. Sept. 14, 2011) (Fitzwater, C.J.)).  In other words, Octapharma is not entitled to dismissal under Rule 12(c) unless Seals has "pleaded [him]self out of court by admitting to all of the elements of the defense." *Id.* (alteration in original) (quoting *Sivertson*, 2011 WL 4100958, at *3).

"Under Texas law, defamation claims generally are subject to a one-year statute of limitations." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 741 (5th Cir. 2019) (citing Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002(a), 16.003(a) (West 2017); *Jackson v. W. Telemarketing Corp.*, 245 F. 3d 518, 523 (5th Cir. 2001)).  The period of limitations begins to run from the date that the cause of action accrues.  Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002(a).  Generally, an action for defamation accrues when the defamatory statement is "published" or "circulated." *Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 636 (Tex. App. 2002, no pet.) (citing *Roe v. Walls Reg'l Hosp., Inc*., 21 S.W.3d 647, 651 (Tex. App. 2000, no pet.)).

B

In the third amended complaint, plaintiffs allege that Seals donated plasma at Octapharma in November or December 2015 and that "[i]n December 2018, Defendant Octapharma wrongly and negligently notified [Seals] that he had tested positive for Hepatitis C and that he and his wife had been placed on [the NDDR]." 3d Compl. ¶ 24.  Octapharma moves to dismiss Seals' defamation claim based on a "Donor Counseling on Test Results"

form ("Donor Counseling Form") that Octapharma attaches to its motion to dismiss. This form, dated December 24, 2015, indicates that Seals was notified on that date of an abnormal test finding for Hepatitis C. Octapharma 8/21/20 App. at Ex. A-7. Based on the Donor Counseling Form, Octapharma maintains that "Seals therefore discovered facts establishing the elements of his allege claims on or about December 24, 2015, yet Seals did not file this lawsuit until September 27, 2019, almost four years later." Octapharma 8/21/20 Mot. 9.

Setting aside the question whether the one-year statute of limitations on Seals's defamation claim would have begun to run on December 24, 2015, when Seals was allegedly notified that he had tested positive for Hepatitis C,[27] the court denies Octapharma's motion to dismiss this claim based on limitations because this affirmative defense does not appear clearly on the face of the pleadings. Plaintiffs allege that Seals was notified in December 2018 that he had tested positive for Hepatitis C and had been placed on the NDDR. 3d Compl. ¶ 24. They do not allege a specific date when Seals's name was added to the NDDR, and, in deciding Octapharma's Rule 12(c) motion, the court is not permitted to consider the Donor Counseling Form, which is neither referenced in the third amended complaint nor central to plaintiffs' defamation claim. *See Lone Star Fund V (U.S.), L.P.*, 594 F.3d at 387. Accordingly, the court denies Octapharma's motion to dismiss Seals's defamation claim on the basis of the affirmative defense of limitations.

Plaintiffs' defamation claim is dismissed with respect to Holt's claim against

---

[27]The Donor Counseling Form dated December 24, 2015 does not mention the date on which Seals's test results were or would be reported to any third party.

Octapharma, and otherwise is not dismissed.

## VII

The court next considers plaintiffs' claims for tortious interference and conspiracy to

commit tortious interference.

## A

To prevail on a claim for tortious interference with prospective business relations, a

plaintiff must establish

> (1) there was a reasonable probability that [the plaintiff] would
> have entered into a business relationship with a third party; (2)
> the defendant either acted with a conscious desire to prevent the
> relationship from occurring or knew the interference was certain
> or substantially certain to occur as a result of the conduct; (3)
> the defendant's conduct was independently tortious or unlawful;
> (4) the interference proximately caused the plaintiff injury; and
> (5) the plaintiff suffered actual damage or loss as a result.

*Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 748 (5th Cir. 2015) (quoting *Coinmach*

*Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)).

In *Anderson I* the court dismissed plaintiffs' tortious interference claim against

BioLife, holding that plaintiffs had failed to plead any allegations establishing a reasonable

probability that Carver would have entered into a business relationship with a third party.

*Anderson I*, 2020 WL 1083608, at *8.  Plaintiffs attempt to cure this deficiency in their third

amended complaint by alleging, *inter alia*, that defendants tortiously interfered with their

rights "to provide donations and be compensated for same by other plasma collection

companies, to obtain employment in the health fields, and to obtain health and life

- 34 -

insurance." 3d Compl. ¶ 54. Plaintiffs assert:

> [p]laintiffs are not allowed to donate at more than one plasma donation company at the same time. If Plaintiffs had not been donating at the plasma donation center at which they were, they would have been donating at another. Defendants and other plasma companies not included in this lawsuit keep track of where Plaintiffs and other donors are donating plasma. Because Plaintiffs are not allowed to donate at more than one company at a time and because they are now barred from donating at ANY plasma donation center, Defendants have made it impossible for Plaintiffs to prove that they would have entered into a business relationship with a third party, except to assert it as fact.

*Id.* ¶ 55.

## B

Defendants move to dismiss plaintiffs' claim for tortious interference on the ground, *inter alia*, that, as in *Anderson I*, plaintiffs have failed to plausibly allege that there was a reasonable probability that they would have entered into a business relationship with a third party. The court agrees. Although plaintiffs allege that defendants interfered with their *rights* to provide donations and be compensated for same by other plasma collection companies, to obtain employment in the health fields, and to obtain health and life insurance, they still have not plausibly pleaded that there was a reasonable probability that any plaintiff *would have* entered into a business relationship with another plasma company, an employer in a health field, or a health or life insurance company. Plaintiffs in fact allege that "Defendants have made it impossible for Plaintiffs to prove that they would have entered into a business relationship with a third party, except to assert it as fact." 3d Compl. ¶ 55. And

the third amended complaint further undermines plaintiffs' ability to plead a plausible claim by alleging that plaintiffs were "not allowed to donate at more than one plasma donation company at the same time." *Id.* In other words, the third amended complaint allows the reasonable inference that it was plaintiffs' decision to donate plasma at one plasma collection company that actually precluded them from donating plasma at another plasma collection company, not any tortious conduct of defendants.

Accordingly, the court grants defendants' motions to dismiss plaintiff's tortious inference claim. *See, e.g., I Love Omni, LLC v. Omnitrition Int'l, Inc.*, 2017 WL 3086035, at *3 (N.D. Tex. July 20, 2017) (Fish, J.) (granting motion to dismiss tortious interference claim where plaintiff "fail[ed] to sufficiently plead that there was a reasonable probability that she would have entered into a business relationship with a third party."); *M-I LLC v. Stelly*, 733 F.Supp.2d 759, 776 (S.D. Tex. 2010) (same).

C

The court also grants defendants' motions to dismiss plaintiffs' claim for conspiracy to commit tortious interference. Civil conspiracy is a "derivative tort" in that "a defendant's liability for conspiracy depends on participation in some underlying tort." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Where the tort claim underlying a claim for civil conspiracy has been dismissed, the civil conspiracy claim must also be dismissed. *See Askanase v. Fatjo*, 130 F.3d 657, 676 (5th Cir. 1997); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 438 (Tex. 1997). Because the court is dismissing plaintiffs' tortious interference claim, it also dismisses their claim for conspiracy to commit tortious

interference.  *See, e.g., Three Legged Monkey, LP v. City of El Paso*, 2014 WL 12639964, at *7 (W.D. Tex. Nov. 10, 2014) (granting motion to dismiss conspiracy claim, noting defendants "cannot be liable for tortious interference, and consequently, cannot be liable for conspiracy to commit tortious interference.").

## VIII

The court next considers plaintiffs' claim for breach of contract.

## A

"A breach of contract claim under Texas law requires proof of four elements: (1) the existence of a valid contract, (2) plaintiff's performance of duties under the contract, (3) defendants' breach of the contract, and (4) damages to plaintiff resulting from the breach." *Orthoflex, Inc. v. ThermoTek, Inc*., 983 F.Supp.2d 866, 872 (N.D. Tex. 2013) (Fitzwater, C.J.) (citation omitted), *aff'd sub nom. Motion Med. Techs., L.L.C. v. ThermoTek, Inc*., 875 F.3d 765 (5th Cir. 2017).  For a valid contract to exist, there must be (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, (5) execution and delivery of the contract with the intent that it be mutual and binding, and (6) consideration.  *Stanissis v. DynCorp Int'l LLC*, 2017 WL 3279148, at *9 (N.D. Tex. Aug. 2, 2017) (Fitzwater, J.) (citing *Angelou v. Afr. Overseas Union*, 33 S.W.3d 269, 278 (Tex. App. 2000, no pet.)).  "In the case of an implied contract, the element of mutual agreement is inferred from the circumstances. . . . and evidenced by the parties' conduct and course of dealing."  *Id*. (quoting *E-Learning LLC v. AT&T Corp*., 517 S.W.3d 849, 858 (Tex. App. 2017, no pet.)).

In *Anderson I* the court dismissed plaintiffs' breach of contract claim asserted against BioLife on the ground that plaintiffs had failed to specify any agreement between Carver and BioLife under which BioLife promised to properly collect, process, handle, and test plaintiffs' plasma donations correctly and had failed to plausibly allege that BioLife had contractually agreed *not to* "improperly disclos[e] false information in violation of Plaintiffs' privacy rights, ba[n] them based on false results and refus[e] to correct the record when proven wrong." *Anderson I*, 2020 WL 1083608, at *9.

In the third amended complaint, plaintiffs allege that they

> were compelled to electronically sign lengthy information attesting to various things such as sexual partners, whether they have given plasma to other companies in a specified time frame, whether they had any tattoos in a specified time period, etc. In exchange for these conditions that Plaintiffs either agree to follow or refrain from doing, they agree to donate plasma in exchange for payment by Defendants. Plaintiffs all upheld their end of the contract by refraining from donating at other facilities and by agreeing to the various terms in the contract. Plaintiffs also upheld their promise to donate their plasma. Defendants agreed with Plaintiffs to properly collect, process, handle, and test Plaintiffs' plasma donations accurately and to compensate Plaintiffs for their donations. Implicit in that contract was Defendants' obligation to protect Plaintiffs' plasma and private information, but Defendants breached that contract by mishandling Plaintiffs' plasma and improperly disclosing false information in violation of Plaintiffs' privacy rights, banning them based on false results and in refusing to correct the record when proven wrong.

3d Compl. ¶ 65.

- 38 -

B

1

BioLife moves to dismiss plaintiffs' breach of contract claim on the ground that plaintiffs have failed to identify an agreement between Carver or Richie and BioLife, or any contractual provision that BioLife allegedly breached.  CSL moves to dismiss Jackson's breach of contract claim on similar grounds.  Octapharma moves to dismiss the contract claim brought by Anderson, Baskett, Seals, and Holt on the ground that these plaintiffs have failed to specify any agreement that they entered into with Octapharma and that, to the extent they rely on an implied contract, Octapharma did not (and could not, consistent with its deferral and reporting obligations) agree to properly test plaintiffs' plasma donations or protect plaintiffs' plasma and private information.  ImmunoTek moves to dismiss Griggs's breach of contract claim on the ground, *inter alia*, that plaintiffs have failed to plausibly allege any specific contractual provision that ImmunoTek purportedly breached.

Plaintiffs respond to each of these arguments by restating the allegations in the third amended complaint and arguing, as they did in *Anderson I*, that even if they do not have a valid and enforceable breach of contract claim, they "may very well have an actionable cause of action for negligent misrepresentation."  Ps. 6/1/20 Resp. 27.[28]

---

[28]The court expresses no view on whether plaintiffs "may very well have an actionable cause of action for negligent misrepresentation," Ps. 6/1/20 Resp. 27, because plaintiffs have not pleaded such a claim.

2

The court holds, as it did in *Anderson I*, that plaintiffs have failed to specify any agreement under which any of the defendants promised—explicitly or implicitly—to "properly collect, process, handle, and test Plaintiffs' plasma donations accurately."  3d Compl. ¶ 65.  The allegations that plaintiffs have added to their third amended complaint permit only the reasonable inference that, in exchange for the compensation they received, plaintiffs agreed to donate plasma and refrain from certain activities.  As in the second amended complaint, plaintiffs allege, in conclusory terms, that defendants "agreed with Plaintiffs to properly collect, process, handle, and test Plaintiffs' plasma donations accurately."  *Id.*  But this conclusory allegation is insufficient of itself to permit the court to draw the reasonable inference that any defendant contractually agreed to these terms.

Moreover, to the extent plaintiffs allege that defendants breached contracts by "improperly disclosing false information in violation of Plaintiffs' privacy rights, banning them based on false results and in refusing to correct the record when proven wrong," *id.*, plaintiffs have failed to plausibly allege that any defendant contractually agreed *not* to engage in the conduct about which they complain. The court holds, as it did in *Anderson I*, that plaintiffs have failed to plausibly allege a specific contractual provision that defendants allegedly breached.[29]  Accordingly, the court grants defendants' motions to dismiss plaintiffs'

---

[29]In response to the motions filed by Octapharma and ImmunoTek, plaintiffs maintain:

> Defendant agreed with the other Defendants and the NDDR to
> remove persons erroneously listed on the registry, and Plaintiffs

- 40 -

claim for breach of contract.

## IX

The court now considers plaintiffs' fraud claim, which is subject to the heightened pleading requirements of Rule 9(b).

## A

Defendants move to dismiss plaintiffs' fraud claim on the ground, *inter alia*, that they have failed to plead the claim with the particularity that Rule 9(b) requires. Plaintiffs respond by quoting the fraud allegations of the third amended complaint and contending that they have pleaded their fraud claim with as much detail as can be expected before an opportunity for discovery. They also maintain that defendants intentionally misled them into thinking that they would not be reported unless they tested positive for HIV; that in reliance on this statement, they agreed to donate plasma, which they would not have done had they known that defendants would knowingly report, ban, and stigmatize them based on false-positive screenings; that defendants misrepresented to each other and to the NDDR that plaintiffs had a "loathsome disease"; that defendants made these material misrepresentations

---

were clearly third party beneficiaries of such agreement and contract; yet, Defendant refused and failed to abide by that, thereby breaching such third party contract for which Plaintiffs are entitled to recover their damages and pursue their other legal rights and remedies.

Ps. 9/30/20 Resp. 30; Ps. 10/30/20 Resp. 28 (same). But plaintiffs have not plausibly pleaded a breach of contract claim based on their alleged status as third party beneficiaries of defendants' agreements with each other and the NDDR, and they cannot avoid dismissal of their breach of contract claim on this basis.

when they knew that plaintiffs' test results were false-positive screenings requiring further testing; that defendants were aware that they were banning, reporting, and unfairly stigmatizing plaintiffs based on what defendants knew were false-positive test results; that defendants intended to induce plaintiffs to act upon their misrepresentations and failures to disclose, soliciting plaintiffs to provide plasma donations for compensation without properly informing them that defendants' own negligence in collecting, handling, and testing the samples would permanently ban plaintiffs from donating blood, plasma, and organs and impair their ability to obtain and retain employment, healthcare, health insurance, and even personal relationships; that defendants did not inform plaintiffs that, even given evidence refuting the false-positive results, defendants would refuse to correct the record and this permanent and far-reaching ban would be based on false test results and that plaintiffs would have no recourse to be removed from this overly expansive ban; that if plaintiffs had been made aware that defendants would be able to permanently ban them based on false positive test results, plaintiffs never would have agreed to donate plasma; and that plaintiffs actually and justifiably relied on defendants' misrepresentations and failure to disclose and suffered injuries as a result.

B

In *Anderson I* the court held that, at a minimum, plaintiffs had failed to plead their fraud claim with the particularity required by Rule 9(b), explaining that "[t]hey refer generally to misrepresentations and omissions, but they do not specify the particulars of time, place, and contents of the false representations or omissions, the identity of any person

making a misrepresentation or omission, or what the person obtained thereby." *Anderson I*, 2020 WL 1083608, at *11. The third amended complaint is similarly deficient.

In the third amended complaint, plaintiffs allege:

> Defendants held themselves out to be qualified and competent medical providers in order to induce Plaintiffs into donating plasma to be sold and/or used by Defendants to make pharmaceutical products to sell in a billion dollar industry. Instead, Defendants were not medical providers; claim not to be subject to medical privacy, although without disclosing that to donors, like Plaintiffs; do not follow proper procedures in collecting, handling, processing, and screening plasma donations, although without disclosing that to donors; do not disclose that known false screening results will be reported to third parties without consent, even though the donor tests negative; use misleading and deceptive terminology like "deferment" instead of lifetime ban; refuse to correct records or remove listings when they know the records and listings to be erroneous; destroy donation samples without consent; and place donors on listing of stigmatized donors who test positive for infectious diseases even[] though Defendants know at the time that such characterization of the donor is wrong.

3d Compl. ¶ 67. By continuing to refer to "defendants," globally, without distinguishing among each of the four defendants, plaintiffs still fail to identify the person making the alleged misrepresentations or omissions. Moreover, plaintiffs have at least failed to plead with specificity the time and place of the alleged false representations or omissions. *See Anderson I*, 2020 WL 1083608, at *11; *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made

- 43 -

the representations misleading." (citation omitted)).

## C

To the extent plaintiffs' fraud claim is based on defendants' alleged failure to disclose certain information—i.e., that they were not subject to medical privacy; that they did not follow procedures in collecting, handling, processing, and screening plasma donations; that known false screening tests would be reported to third parties without consent; and that defendants would refuse to correct records or remove listings when they know they were erroneous, would refuse to obtain further and confirmatory testing or obtain new samples for testing, would destroy donation samples without consent, and would place donors on the NDDR even though they knew donors did not have infectious diseases—the court raises *sua sponte*[30] that plaintiffs have failed to plausibly allege that defendants had a duty to disclose the allegedly withheld information.

The elements of common law fraud in Texas are:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Choe v. Bank of Am., N.A.*, 2013 WL 3196571, at *5 (N.D. Tex. June 25, 2013) (Fitzwater, C.J.) (quoting *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004)),

---

[30]As noted above, a district court has the authority to consider the sufficiency of a complaint and dismiss an action *sua sponte*, as long as the procedure it employs is fair. *See supra* note 16. Because the court is permitting plaintiffs to respond to this ground for dismissal, *see infra* § XIII, the procedure employed here is fair.

*aff'd*, 605 Fed. Appx. 316 (5th Cir. 2015).  "The first requirement of this test can be met if the defendant concealed or failed to disclose a material fact when a duty to disclose existed." *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005).

"As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information."  *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).  A duty to disclose exists:

> (1) where there is a special or fiduciary relationship; (2) where one voluntarily discloses partial information, but fails to disclose the whole truth; (3) where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue; [or] (4) where one makes a partial disclosure and conveys a false impression.

*In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 388 F.Supp.2d 780, 788 (S.D. Tex. 2005).

Plaintiffs do not allege that defendants had a duty to disclose with respect to the omissions they plead in the third amended complaint.  Thus to the extent that plaintiffs' fraud claim is based on defendants' alleged failure to disclose information, the court raises *sua sponte* that the claim fails because plaintiffs have not plausibly alleged a duty to disclose.

The court concludes that plaintiffs' fraud claim should in part be dismissed and is in part subject to dismissal on a ground that the court is raising *sua sponte*.

X

The court next considers plaintiffs' claim for violation of privacy rights.

A

In *Anderson I* the court held that plaintiffs' conclusory allegations in support of their claim for violation of privacy rights were insufficient to plausibly plead that BioLife violated any particular state law with respect to Carver. *Anderson I*, 2020 WL 1083608, at *11. In the third amended complaint, plaintiffs allege that screening results on plaintiffs' plasma is confidential medical information and that plaintiffs did not knowingly consent to defendants' sharing plaintiffs' confidential medical information with each other, citing Tex. Health & Safety Code Ann. §§ 161.009, 161.002, 181.001(b)(2)(B), and 181.154(b) (West 2017), in support. *See* 3d Compl. ¶ 68.

BioLife moves to dismiss plaintiffs' violation of privacy rights claim, arguing that none of the four statutes plaintiffs cite establishes a tort of "violation of privacy rights." With respect to Tex. Health & Safety Code Ann. §§ 161.009 and 161.002, BioLife argues that these statutes relate to immunization registration information; that plaintiffs do not allege that BioLife disclosed immunization registration information; and that plaintiffs make no claim relating to the immunization of an individual. Regarding Tex. Health & Safety Code Ann. §§ 181.001(b)(2)(B) and 181.154(b), BioLife argues that, even assuming these statutes apply to BioLife or the information it collects, Carver and Richie expressly consented to the disclosure, and § 181.154(c)(2) provides that consent is not required when the disclosure is otherwise authorized or required by state or federal law, as it was here. CSL moves to

dismiss plaintiffs' violation of privacy rights claim on essentially the same grounds. Octapharma also moves to dismiss plaintiffs' violation of privacy rights claim, contending that Texas does not recognize such a claim; plaintiffs have failed to allege how Octapharma's reporting, to which plaintiffs consented, could have violated their privacy rights; and Octapharma's reporting of plaintiffs' screening results to the NDDR complied with the requirements of the NDDR standard.  ImmunoTek moves to dismiss plaintiffs' violation of privacy rights claim on the ground, *inter alia*, that the Texas statutes plaintiffs cite in the third amended complaint are inapplicable to establish a claim for a violation of privacy rights.

Plaintiffs respond that BioLife has failed to address the false disclosure to parties other than the state health authorities, such as other plasma collection companies and the NDDR; that defendants knew or should have known that they were reporting *false* test results to state authorities, the NDDR, and their competitor plasma companies; that they have pleaded enough facts to withstand defendants' motion under Rules 12(b)(6) and  12(c); and that they did not consent to defendants' sharing their confidential medical information with other plasma collection companies, and did not consent to the disclosure of negligently obtained and *false* personal medical information to other plasma collection companies.

B

To the extent that plaintiffs base their "violation of privacy rights" claim on Tex. Health & Safety Code Ann. §§ 161.009 or 161.002, the court agrees that plaintiffs have not plausibly alleged a claim under either statute.  Section 161.009 makes it a misdemeanor

offense if a person, *inter alia*, discloses immunization registry information, and § 161.002 provides that "[i]nformation obtained from a physician's medical records by a person conducting an immunization survey for the department is not admissible as evidence in a suit against the physician that involves an injury relating to the immunization of an individual." Because there is no allegation that defendants improperly used plaintiffs' immunization information, plaintiffs cannot state a claim based on either of these statutes.

To the extent that plaintiffs attempt to plead a "violation of privacy rights" claim under Tex. Health & Safety Code Ann. § 181.154(b), a provision of the Texas Medical Records Privacy Act ("TMRPA"), this statute, like its federal counterpart, the Health Insurance Portability & Accountability Act ("HIPAA"), does not create a private right of action.[31]  *See* Tex. Health & Safety Code Ann. § 181.201 (authorizing attorney general to institute action for injunctive relief or civil penalties but not authorizing private right of action); *Sloan v. Farmer*, 217 S.W.3d 763, 766 (Tex. App. 2007, pet. denied) ("[N]either [HIPAA] nor the TMRPA provide a private remedy."); *see also, e.g., Acara v. Banks*, 470 F.3d 569, 572 (5th Cir. 2006) (per curiam) ("[T]here is no private cause of action under HIPAA.").

_____

[31]In response to BioLife's motion to dismiss, plaintiffs cite *TTHR, L.P. v. Coffman*, 338 S.W.3d 103 (Tex. App. 2011, no pet.), for the proposition that the "violation of [a] patient's confidentiality and wrongful release of medical information is legally actionable." Ps. 6/1/20 Resp. 32.  But in *TTHR* the plaintiff alleged a violation of Tex. Occ. Code Ann. § 159.002 (West 2012), for which the statute explicitly creates a private right of action.  *See* Tex. Occ. Code Ann. § 159.009(b) (authorizing person aggrieved by violation of statute to bring a cause of action for civil damages).

In support of their claim for "violation of privacy rights," plaintiffs have failed to plead that defendants violated any particular state law—either a statute or recognized common law cause of action—when these defendants allegedly disclosed plaintiffs' confidential medical information. Accordingly, the court grants defendants' motions to dismiss this claim.

XI

The court now considers plaintiffs' declaratory judgment claim.

A

In the third amended complaint, plaintiffs seek a declaration that they are not HIV positive, and they request an order compelling defendants to correct each of their records, including any national database entries, registries, or lists. They allege that "[t]his relief is not merely sought to correct a past wrong, but to mitigate against ongoing harm caused by [the] continued . . . lifetime ban on donations and wrongful inclusion on a national list of stigmatized donors." 3d Compl. ¶ 70.

BioLife moves to dismiss plaintiffs' declaratory judgment claim on the ground that, as in *Anderson I*, plaintiffs' request for a declaratory judgment is still essentially seeking to remedy a past wrong. CSL, Octapharma, and ImmunoTek move for judgment on the same ground and on the basis that, to the extent plaintiffs allege that they are experiencing continuing harm due to the loss of certain rights—i.e., to donate blood, to receive organ transplants, to obtain employment in health fields, and to obtain health and life insurance information—they do not plausibly allege that their inclusion on the NDDR would preclude

- 49 -

them from exercising such "rights."

Plaintiffs respond that the relief they are seeking is not merely to correct a past wrong but to mitigate ongoing harm caused by the continued lifetime ban on donations and wrongful inclusion on the NDDR; that defendants have used false test results to ban them from ever again donating blood, plasma, or organs; that the false stigmatization will likely impair plaintiffs' rights and abilities to obtain medical care, employment, and health and life insurance; and that "[b]eing falsely accused of having a foul or loathsome disease, placed on a banned list with no means of being removed despite the allegations being erroneous is actual present and future harm that could and should be addressed by a declaratory judgment."  Ps. 6/1/20 Resp. 33; *see also* Ps. 8/7/20 Resp. 32 (same); Ps. 9/30/20 Resp. 35 (same); Ps. 10/30/20 Resp. 33 (same).

B

Federal courts have broad discretion to grant or refuse declaratory judgment.  *See Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).  In *Anderson I* the court explained that it had previously declined in its discretion to enter declaratory judgments when the parties sought to remedy past wrongs.  *Anderson I*, 2020 WL 1083608, at *12.  It granted BioLife's motion to dismiss plaintiffs' declaratory judgment claim on the ground that "[t]he relief that plaintiffs seek—even in the form of mandatory injunctive relief—is essentially to remedy a past alleged wrong."  *Id.*

It is undisputed that the reporting of plaintiffs' false-positive test results occurred in the past.  "To obtain equitable relief for past wrongs, a plaintiff must demonstrate either

- 50 -

continuing harm or a real and immediate threat of repeated injury in the future." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992); *see also Arnett v. Strayhorn*, 515 F.Supp.2d 699, 704 (W.D. Tex. 2006) (same).

But in the third amended complaint, plaintiffs now allege that they seek injunctive relief "to mitigate against *ongoing harm* caused by [the] continued . . . lifetime ban on donations and wrongful inclusion on a national list of stigmatized donors." 3d Compl. ¶ 70 (emphasis added). This is sufficient to plausibly allege that, as a result of false positive test results being reported to the NDDR, plaintiffs cannot (now or in the future) donate plasma. The court holds that this allegation is sufficient, at the pleading stage, to plausibly plead a continuing harm, and it declines at this time to dismiss plaintiffs' declaratory judgment claim.

XII

Because the court is granting defendants' motions to dismiss in part, it must address plaintiffs' request for leave to amend.

The determination whether to grant leave to replead is a matter within the court's discretion. *See, e.g., ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 362 (5th Cir. 2002). The court has already afforded plaintiffs one opportunity to rectify the defects in their complaint. *See Anderson I*, 2020 WL 1083608, at *12. Although today's decision is the first time the court has addressed defects in plaintiffs' claims asserted against CSL, Octapharma, and ImmunoTek, the court concludes that fairness does not require an additional opportunity to replead because the claims against these defendants are nearly identical to the claims against BioLife. Plaintiffs were aware of the court's decision in *Anderson I* and therefore

- 51 -

had a fair opportunity to plead plausible claims in their third amended complaint. They have

offered no persuasive basis for the court to conclude that, if afforded still another opportunity

to amend, plaintiffs could file a revised complaint that would yield a different outcome.

Accordingly, the court in its discretion denies plaintiffs' request for leave to replead yet

again. *See ABC Arbitrage*, 291 F.3d at 362 (concluding that district court did not abuse its

discretion by denying leave to replead where court had already given plaintiffs one

opportunity to do so).

XIII

The court has raised four grounds for dismissal *sua sponte*: that BioLife is entitled to

dismissal of plaintiffs' negligent reporting claim because neither Carver nor Richie disputes

that he or she in fact tested reactive for HIV; that BioLife, Octapharma, and ImmunoTek are

entitled to dismissal of plaintiffs' negligent testing claim on the alternate basis that plaintiffs

have failed to plausibly allege that, under Texas law, plasma collection centers owe donors

a duty to obtain, handle, process, and test blood donations with reasonable care; that BioLife

is entitled to dismissal of plaintiffs' negligent testing claim on the alternate ground that

plaintiffs have failed to plausibly allege the breach of a legal duty; and that to the extent

plaintiffs base their fraud claim on defendants' alleged failure to disclose, they have failed

to plead any duty to disclose the allegedly withheld information. It is permissible for the

court to raise these grounds on its own, provided the court does so under a procedure that is

fair. *See Biggers v. BAC Home Loans Servicing, LP*, 767 F.Supp.2d 725, 733-34 n.7 (N.D.

Tex. 2011) (Fitzwater, C.J.). "Even if a party does not make a formal motion under Rule

12(b)(6), the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties." 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 409 (3d ed. 2004). To ensure that this procedure is fair to plaintiffs, the court grants them 21 days from the date of this memorandum opinion and order to file a brief that sets out their opposition to dismissing their claims for negligent reporting, negligent testing, and fraud on the bases that the court has raised *sua sponte*. After considering plaintiffs' response, the court will determine whether to invite defendants to file replies.

*   *   *

Accordingly, for the reasons explained, the court grants in part and denies in part BioLife's motion to dismiss under Rule 12(b)(6) and CSL's, Octapharma's, and ImmunoTek's motions for judgment on the pleadings. The court grants plaintiffs 21 days from the date this memorandum opinion and order is filed to file an opposition response to the grounds for dismissal that the court has raised *sua sponte*.

**SO ORDERED**.

December 9, 2020.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 53 -